UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNIVERSAL MUSLIM ASSOCIATION OF<br>AMERICA, INC.<br>1701 Pennsylvania Ave. NW<br>Washington, DC 20004<br><br>JOHN DOE<br><br>JANE DOE<br><br>             Plaintiffs,<br><br>     v.<br><br>DONALD J. TRUMP, in his official capacity as<br>President of the United States;<br>1600 Pennsylvania Avenue NW<br>Washington, DC 20500<br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY<br>3801 Nebraska Ave. NW<br>Washington, DC 20016<br><br>U.S. CUSTOMS AND BORDER PROTECTION<br>1300 Pennsylvania Ave. NW<br>Washington, DC 20004<br><br>U.S. DEPARTMENT OF STATE<br>2201 C Street, NW<br>Washington, DC 20530<br><br>U.S. DEPARTMENT OF JUSTICE<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530<br><br>JOHN KELLY, in his official capacity as Secretary<br>of the Department of Homeland Security<br>3801 Nebraska Ave. NW<br>Washington, DC 20016 | Case No. _____ |

KEVIN K. MCALEENAN, in his official capacity
as Acting Commissioner of U.S. Customs and
Border Protection
1300 Pennsylvania Ave. NW
Washington, DC 20004

REX W. TILLERSON, in his official capacity as
Secretary of State
2201 C Street, NW
Washington, DC 20530

JEFFERSON BEAUREGARD SESSIONS III, in
his official capacity as Attorney General of the
United States
950 Pennsylvania Avenue, NW
Washington, DC 20530

Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.        The Plaintiffs are two Yemeni nationals and an organization of American Shi'a

Muslims.  The Plaintiffs bring this case to challenge President Donald J. Trump's March 6, 2017

Executive Order 13,780, entitled "Protecting the Nation from Foreign Terrorist Entry into the

United States."  Executive Order 13,780 is intended to, and does, temporarily bar many nationals

from six Muslim-majority countries, including Yemen, from entering the United States.

Executive Order 13,780 harms the Plaintiffs, and all Muslims living in the United States by

subjecting them to hostile treatment under law and by inflicting a damaging stigma upon them

based on their religious affiliation.

2.      The United States has always been a nation of immigrants.  Whether fleeing from war, tyranny, or persecution, or simply hoping to build a better life, immigrants have long traversed American shores in search of the rights and freedoms guaranteed in the United States and enshrined in its Constitution.  These immigrants have played a crucial role in shaping this country, and they have rightly been embraced as part of the fabric of American democracy.

3.      Executive Order 13,780 taints this proud heritage.  The order purports to "protect" the nation from "foreign terrorist[s]."  Instead, it ushers in a sweeping ban of most nationals of six Muslim-majority countries from entering the United States.  The president's own security agencies have repudiated the broad stereotypes and crude generalizations underlying the order's putative justification and instead shown that country of citizenship is no reliable proxy for terrorist threat.

4.      During his Presidential Campaign, then-Candidate Trump repeatedly condemned what he calls "radical Islam," linking Islam to terrorism and calling for a "total and complete shutdown of Muslims entering the United States."  Executive Order 13,780 is the Trump Administration's second attempt to enact this policy "legally."  Despite the Administration's efforts to construct a "national security" justification for the order, a litany of statements from the president and his surrogates  illustrate the Trump Administration's animus toward Muslims and indicate that such a policy can never be "legal."

5.      Executive Order 13,780 and its identically-named predecessor, Executive Order 13,769, are predicated on invidious animus.  The executive orders ignore the commands of the law, the courts, and the Constitution.  The harms to Plaintiffs caused by Executive Order 13,780 are certain, imminent, and irreparable.  Plaintiffs accordingly petition this Court for declaratory and injunctive relief against its enforcement and implementation.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction under 28 U.S.C. § 1331.

7.      The Court may award declaratory and injunctive relief under the Declaratory

Judgment Act, 28 §§ 2201-02, and the Administrative Procedure Act, 5 U.S.C. § 706.

8.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (e)(1) because

Defendants are United States agencies or officers sued in their official capacities; a substantial

part of the events or omissions giving rise to this claim occurred in this district; and one of the

plaintiffs, the Universal Muslim Association of America, Inc., maintains its headquarters in this

district.

## PARTIES

**A.      Plaintiffs**

9.      Mr. and Mrs. Doe are citizens of Yemen and reside in the United States under

asylum status.  The Does and their family adhere to the religion of Islam.

10.      The Universal Muslim Association of America, Inc. (UMAA) is the largest

organization of Shi'a Muslims in the United States.  It is a nonprofit corporation organized under

the laws of Maryland and registered under section 501(c)(3) of the Internal Revenue Code.

UMAA aims to provide a platform for American Shi'a Muslims to advance political, social,

economic, and religious goals important to their community. UMAA provides American Shi'a

Muslims a forum to foster intra-faith unity, to participate in civic and political responsibilities, to

dispel misgivings about Islam and Muslims, and to help fellow Americans better understand

Islam.  UMAA also provides American Shi'a Muslims access to advanced levels of Islamic

education by offering short, intensive courses on a variety of subjects presented by senior Islamic seminary students and scholars, many of whom come from Iraq and Iran. UMAA's email distribution list for its weekly newsletters currently includes 17,269 subscribers, and UMAA's national convention draws thousands of attendees annually. UMAA maintains a national organization as well as local chapters across the country. In addition to the annual convention, UMAA also holds other events for the American Shi'a community throughout the year. For its events, UMAA often invites prominent Shi'a scholars—many from Iran and Iraq—to appear as speakers, so that its members may experience their teachings and perspectives.

**B.    Defendants**

11.    Defendant Donald J. Trump is the President of the United States and is sued in his official capacity. President Trump issued Executive Orders 13,769 and 13,780.

12.    Defendant Department of Homeland Security ("DHS") is an executive department of the United States government. DHS is headquartered in Washington, D.C.

13.    Defendant U.S. Customs and Border Patrol ("CBP") is an administrative agency within the DHS. CBP is headquartered in Washington, D.C.

14.    Defendant Department of State is an executive department of the United States government. The State Department is headquartered in Washington, D.C.

15.    Defendant Department of Justice ("DOJ") is an executive department of the United States government. DOJ is headquartered in Washington, D.C.

16.    Defendant John Kelly is the Secretary of Homeland Security and is sued in his official capacity. Secretary Kelly is responsible for DHS's administration of the Immigration and Nationality Act.

17.     Defendant Kevin McAleenan is the Acting Commissioner of Customs and Border Protection and is sued in his official capacity.  Acting Commissioner McAleenan is directly responsible for CBP's implementation of the Immigration and Nationality Act.

18.     Defendant Rex W. Tillerson is the Secretary of State and is sued in his official capacity.  Secretary Tillerson oversees the Department of State's activities with respect to the Immigration and Nationality Act.

19.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States and is sued in his official capacity.  Attorney General Sessions oversees the DOJ's activities with respect to the Immigration and Nationality Act.

## STATEMENT OF FACTS

### A.     The Does

20.     Mr. and Mrs. Doe came to the United States from Yemen.  The Does are Yemeni nationals living in the United States as asylees.  The Does and their family adhere to the religion of Islam.

21.     In 2015, Yemen collapsed into civil war.  The conflict, which to this day is ongoing, has resulted in more than 10,000 civilian deaths and 40,000 civilian injuries.[1]  As a result of the civil war and a contemporaneous famine, United Nations officials reported this year

---

[1] *Death toll in Yemen conflict passes 10,000*, AL JAZEERA (Jan. 16, 2017), http://www.aljazeera.com/news/2017/01/death-toll-yemen-conflict-passes-10000-170117040849576.html, Weiner Declaration at Ex. 43.

that over 10 million Yemeni civilians need urgent assistance to protect their safety, dignity, and basic human rights.[2]

22.      In early 2015, the Does came to the United States on visas with three of their children. But they could not afford the cost of bringing their remaining two children, sons ages 10 and 12, who stayed behind in Yemen with their grandmother. Mr. Doe later received word from Yemen that militants had threatened to kill him and his family if he returned. The militants also threatened to kidnap his two sons who were still in Yemen.

23.      With the help of an immigration attorney, Mr. Doe successfully applied for asylum in the United States. Mr. Doe then petitioned for his two sons who were still living in Yemen to obtain visas to enter the United States on the basis of their status as minor children of an asylee pursuant to Section 208(b)(3) of the Immigration and Nationality Act (INA). Mr. Doe's petition was approved in late 2016. The next step in the sons' visa application process is an interview with a United States consulate or embassy abroad, but Yemen does not have a United States consulate or embassy. The boys have fled Yemen to escape the violence there and are now living in Djibouti waiting for their consular interviews to be scheduled. Given the expense of staying in Djibouti, the boys will be forced to return to Yemen unless they can receive their visas to come to the United States.

**B.      UMAA and the American Shi'a Muslim Community**

---

[2] *Id.*

24.     Shi'ism is the second largest denomination of Islam in the world, comprising around ten to fifteen percent of the global and American Muslim populations. Shi'a Muslims believe in a hierarchical structure of religious clergy, with the most learned given the highest religious authority, transnationally. While Shi'a adherents can be found in many nations, they form the majority in Iran, Iraq, Azerbaijan and Bahrain and make up close to half of all Muslims in the Middle East. Shi'a Islam is distinct from other major religions in that nearly all of its highest-ranking scholars live in the nations of Iran, Iraq and Syria. These three nations are also where some of the holiest sites of Shi'a Islam are located, drawing millions of Shi'a Muslims from across the world annually, including from the United States. In fact, the largest annual peaceful gathering on Earth occurs at Karbala, Iraq, on the solemn Shi'a festival known as Arba'een, which drew a reported 22 million pilgrims on a single day in 2013.

25.     UMAA regularly arranges for renowned Shi'a scholars to visit the United States. so that they may speak at its events, including its national convention. Because the most renowned Shi'a scholars are centralized in Iran and Iraq, many of the foreign speakers at UMAA's events are Iranian or Iraqi.

**C.     President Trump's Campaign Pledge to Ban Muslims from the United States**

26.     Prior to taking office, then-candidate Donald J. Trump made discrimination against Muslims a central pillar of his campaign for the presidency.

27.    On November 18, 2015, in response to terror attacks in Paris, Mr. Trump stated that "[w]e're going to have no choice" but to close down some mosques in the United States, where "some bad things are happening."[3]

28.    On December 7, 2015, in the wake of the attack in San Bernardino, California, then-candidate Mr. Trump released a written statement, entitled "Donald J. Trump Statement on Preventing Muslim Immigration," which called for a "total and complete shutdown on Muslims entering the United States until our country's representatives can figure out what is going on."[4]

29.    The statement continued:

> According to Pew Research, among others, there is **great hatred towards Americans by large segments of the Muslim population**. Most recently, a poll from the Center for Security Policy released data showing "25% of those polled agreed that violence against Americans here in the United States is justified as a part of the global jihad" and 51% of those polled, "agreed that Muslims in America should have the choice of being governed according to Shariah." Shariah authorizes such atrocities as

---

[3] Nick Gass, *Trump: 'Absolutely no choice' but to close mosques*, POLITICO (Nov. 18, 2015, 6:45 AM), http://www.politico.com/story/2015/11/trump-close-mosques-216008, Weiner Declaration at Ex. 3.

[4] Donald J. Trump, *Donald J. Trump Statement on Preventing Muslim Immigration*, DONALDJTRUMP.COM (Dec. 7, 2015), https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration, Weiner Declaration at Ex. 4 .

murder against non-believers who won't convert, beheadings and more

unthinkable acts that pose great harm to Americans, especially women.[5]

30.     The survey cited in the statement had long since been discredited,[6] but the

message was clear:  Mr. Trump believes that many Muslims bear hostile attitudes toward the

United States and favor violent ideology over American law and—for that reason—immigration

by Muslims to the United States should be suspended.

31.     This proposed "Muslim ban" became a core promise of the Trump campaign,

repeated by Mr. Trump and his advisors and surrogates at campaign events across the country.

---

[5] *Id.* (emphasis added).

[6] The Center for Security Policy's study used an online "opt-in" poll, rather than a traditional
sampling model.  Results of these "opt-in" polls do not represent the opinions of larger
populations because anyone can respond to them and the pollster has no way of knowing who the
respondents are.  *See* The Bridge Initiative Team, *Trump Calls for Ban on Muslims, Cites Deeply
Flawed Poll*, GEORGETOWN UNIVERSITY (Dec. 7, 2015, 6:48 AM),
http://bridge.georgetown.edu/new-poll-on-american-muslims-is-grounded-in-bias-riddled-with-
flaws/, Weiner Declaration at Ex. 61 (discussing unreliability of "opt-in" polling and explaining
that the Center for Security Policy's survey also used "leading" questions and included multiple-
choice questions with non-exhaustive answer choices); Lauren Carroll & Louis Jacobson, *Trump
cites shaky survey in call to ban Muslims from entering US*, POLITIFACT (Dec. 9, 2015, 3:48
PM), http://www.politifact.com/truth-o-meter/statements/2015/dec/09/donald-trump/trump-cites-
shaky-survey-call-ban-muslims-entering/, Weiner Declaration at Ex. 64 (rating the survey's
conclusion "mostly false" due to unreliable methodology an noting that the Center for Security
Policy's president, Frank Gaffney, has a history of spreading untrue theories about Islam,
including arguing that President Barack Obama was a Muslim (citing Frank Gaffney, *Gaffney:
America's first Muslim president?*, WASHINGTON TIMES (June 9, 2009),
http://www.washingtontimes.com/news/2009/jun/9/americas-first-muslim-president/, Weiner
Declaration at Ex. 63.)).

32.     Asked during a televised debate on January 14, 2016, whether he had rethought his "comments about banning Muslims from entering the country," Mr. Trump responded, "No."[7]

33.     On March 9, 2016, Mr. Trump stated in a televised interview, "I think Islam hates us."[8] The full exchange between Mr. Trump and CNN's Anderson Cooper is instructive:

> Cooper:  Do you think Islam is at war with the West?
>
> Trump:  *I think Islam hates us.* There is something—there is something there that is a tremendous hatred there. There's a tremendous hatred. We have to get to the bottom of it. There's an unbelievable hatred of us.
>
> Cooper:  In Islam itself?
>
> Trump:  You're going to have to figure that out. OK. You'll get another Pulitzer, right? But you'll have to figure that out. But there's a tremendous hatred. And we have to be very vigilant. We have to be very careful. And *we can't allow people coming into this country who have this hatred of the United States . . . and of people that are not Muslim.*
>
> Cooper:  I guess the question is, is there a war between the west and radical Islam or between the west and Islam itself?
>
> Trump:  Well, it's radical but it's very hard to define. It's very hard to separate because you don't know who is who.[9]

---

[7] Gerhard Peters & John T. Wooley, *Presidential Candidate Debates: Republican Candidates Debate in North Charleston, South Carolina*, THE AMERICAN PRESIDENCY PROJECT (Jan. 14, 2016), http://www.presidency.ucsb.edu/ws/index.php?pid=111395, Weiner Declaration at Ex. 7.

[8] *Exclusive Interview with Donald Trump: Aired March 9, 2016 - 20:00 ET*, CNN (Mar. 9, 2016), http://www.cnn.com/TRANSCRIPTS/1603/09/acd.01.html, Weiner Declaration at Ex. 8.

[9] *Id.* (emphasis added).

34.      Amid widespread outcry that the proposed Muslim ban would be un-American

and unconstitutional, Mr. Trump and his advisors began shifting their rhetoric, while clarifying

that their goal continued to be some form of a ban on immigration by Muslims.

35.      On June 13, 2016, after the attack on a nightclub in Orlando, Florida, Mr. Trump

said in a speech: "I called for a ban after San Bernardino, and was met with great scorn and

anger, but now many are saying I was right to do so."[10]

36.      Mr. Trump then specified that the ban would be "temporary," and would apply to

certain "areas of the world when [sic] there is a proven history of terrorism against the United

States, Europe or our allies, until we understand how to end these threats."[11]

37.      Next, in a July 17, 2016 televised interview, Mr. Trump was confronted with his

then-running mate Mike Pence's statement that a Muslim ban would be unconstitutional.

Mr. Trump responded that the same purpose of stemming the flow of Muslim immigrants would

be pursued by other ends: "So you call it territories, okay?  We're gonna do territories."[12]

38.      A week later, in a July 24, 2016 interview, Mr. Trump was asked if his shifting

rhetoric signified a "rollback" from his proposed "Muslim ban." He answered: "I don't think so.

---

[10] *Transcript: Donald Trump's national security speech*, POLITICO (Jun. 13, 2016, 3:06 PM),
http://www.politico.com/story/2016/06/transcript-donald-trump-national-security-speech-224273, Weiner Declaration at Ex. 10.

[11] *Id.*

[12] Lesley Stahl, *The Republican Ticket: Trump and Pence*, CBS NEWS (Jul. 17, 2016),
http://www.cbsnews.com/news/60-minutes-trump-pence-republican-ticket/, Weiner Declaration
at Ex. 64.

I actually don't think it's a rollback.  In fact, you could say it's an expansion.  I'm looking now at territories.  People were so upset when I used the word Muslim.  '*Oh, you can't use the word Muslim.*' . . . And I'm okay with that, because I'm talking territory instead of Muslim."[13]

39.    And on October 9, 2016, during a televised presidential debate, Mr. Trump stated, "The Muslim ban is something that in some form has morphed into a[n] extreme vetting from certain areas of the world."[14]

40.    As of the date of this complaint, the Trump campaign's December 7, 2015 press release entitled "Donald J. Trump Statement on Preventing Muslim Immigration" remains on the Donald J. Trump campaign website[15] and on President Trump's Twitter page,[16] which President Trump has continued to use regularly even after taking office.

**D.    The First Executive Order**

41.    On January 27, 2017, President Trump fulfilled his campaign promise by signing Executive Order 13,769 entitled "Protecting the Nation from Foreign Terrorist Entry into the

---

[13] *Meet the Press - July 24, 2016*, NBC NEWS (Jul. 24, 2016, 11:47 AM), http://www.nbcnews.com/meet-the-press/meet-press-july-24-2016-n615706, Weiner Declaration at Ex. 11.

[14] Gerhard Peters & John T. Wooley, *Presidential Debate at Washington University in St. Louis, Missouri*, THE AMERICAN PRESIDENCY PROJECT (Oct. 9, 2016), http://www.presidency.ucsb.edu/ws/index.php?pid=119038, Weiner Declaration at Ex. 65.

[15] *See* Donald J. Trump, *Donald J. Trump Statement on Preventing Muslim Immigration*, DONALDJTRUMP.COM (Dec. 7, 2015), https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration, Weiner Declaration at Ex. 4.

[16] *See* Donald J. Trump (@realDonaldTrump), TWITTER (Dec. 7, 2015); https://twitter.com/realDonaldTrump/status/673993417429524480, Weiner Declaration at Ex. 5.

United States" ("First Executive Order").[17]  At the signing ceremony, after reading the title of the

First Executive Order aloud, President Trump remarked "We all know what that means."[18]

42.     On January 30, 2017, President Trump confirmed what he meant, referring to

Executive Order 13,769 as "the ban." [19]

43.     Among other things, the First Executive Order temporarily banned entry of all

nationals from seven overwhelmingly Muslim countries, temporarily suspended the entire United

States Refugee Admissions Program, established a policy of prioritizing certain religious

denominations over others upon resuming the program, and indefinitely barred entry of Syrian

refugees.[20]  The First Executive Order also provided that the President could expand the list of

seven countries initially designated.[21]  In addition, the First Executive Order included among its

"purposes" that the United States should not admit individuals who "place violent ideologies

---

[17] 82 Fed. Reg. 8977 (Jan. 27, 2017).

[18] Matt Shuham, *Trump Signs Executive Order Laying Out 'Extreme Vetting,'* TALKING POINTS MEMO (Jan. 27, 2017, 4:56 PM), http://talkingpointsmemo.com/livewire/trump-signs-vetting-executive-order, Weiner Declaration at Ex. 66.

[19] Donald J. Trump (@realDonaldTrump), TWITTER (Jan. 30, 2017), https://twitter.com/realDonaldTrump/status/826060143825666051, Weiner Declaration at Ex. 67; *see also* Donald J. Trump (@real DonaldTrump), TWITTER (Feb. 1, 2017), https://twitter.com/realDonaldTrump/status/826774668245946368, Weiner Declaration at Ex. 68 ("Everybody is arguing whether or not it is a BAN.  Call it what you want, it is about keeping bad people (with bad intentions) out of country!").

[20] *See* 82 Fed. Reg. 8977 §§ 3(c), 5(b)-(c).

[21] *Id.* § 3(e)-(f).

over American law" or who engage in acts of hatred or bigotry "including so called 'honor killings' or other forms of violence against women."[22]

44.     Section 10 of the First Executive Order mandated that the Secretary of Homeland Security, in consultation with the Attorney General, collect and make publicly available information related to "foreign nationals in the United States who have been radicalized after entry into the United States" and "honor killings in the United States by foreign nationals."

45.     On the day he signed the First Executive Order, asked whether he saw Christian refugees as a priority, President Trump responded unequivocally: "Yes."[23]

46.     This religious preference was reflected in Sections 5(b) and 5(e) of the First Executive Order, which prioritized refugee claims based on religious-based persecution for individuals whose religion is a "minority religion in the individual's country of nationality." As a practical matter, the vast majority of the 38,000 Muslim refugees admitted to the United States

---

[22] *Id.* § 1.

[23] David Brody, *Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority Status As Refugees*, CHRISTIAN BROADCAST NETWORK (Jan. 27, 2017), http://www1.cbn.com/thebrodyfile/archive/2017/01/27/brody-file-exclusive-president-trump-says-persecuted-christians-will-be-given-priority-as-refugees, Weiner Declaration at Ex. 18. ("If you were a Muslim [in Syria] you could come in [to the United States], but if you were a Christian, it was almost impossible . . . . And I thought it was very, very unfair.  So we are going to help them [Christian refugees]"); *see also* Donald J. Trump (@realDonaldTrump), TWITTER (Jan. 29, 2017, 7:03 AM), https://twitter.com/realDonaldTrump/status/825721153142521858; Weiner Declaration at Ex. 69 ("Christians in the Middle-East have been executed in large numbers. We cannot allow this horror to continue!").

in 2016 were nationals of Muslim-majority countries, thus rendering the majority of Muslim refugees ineligible for the religious-based persecution preference.[24]

47.     The following day, January 28, 2017, President Trump's advisor and surrogate Rudy Giuliani admitted that the policy implemented in the First Executive Order resulted from an instruction by the President to find "the right way" to "legally" implement the "Muslim ban."[25]

**E.     The First Executive Order Was Enjoined by the Courts.**

48.     The First Executive Order was immediately met with a series of legal challenges across the country, including in the United States District Courts for the Eastern District of New York, the Western District of Washington, and the Eastern District of Virginia.

49.     The day after the First Executive Order was issued, the United States District Court for the Eastern District of New York granted an Emergency Motion for Stay of Removal, enjoining executive-branch officials from removing individuals with approved applications under the United States Refugee Admissions Program, holders of immigrant and non-immigrant visas, and other individuals legally authorized to enter the United States from the seven countries designated in the First Executive Order. *Darweesh v. Trump*, No. 1:17-cv-00480, ECF 8 at 2

---

[24] *See* Phillip Connor, *U.S. admits record number of Muslim refugees in 2016*, PEW RESEARCH CENTER (Oct. 5, 2016), http://www.pewresearch.org/fact-tank/2016/10/05/u-s-admits-record-number-of-muslim-refugees-in-2016/, Weiner Declaration at Ex. 70.

[25] *See* Rebecca Savransky, *Giuliani: Trump asked me how to do a Muslim ban 'legally,'* THE HILL (Jan. 29, 2017, 8:48 AM), http://thehill.com/homenews/administration/316726-giuliani-trump-asked-me-how-to-do-a-muslim-ban-legally, Weiner Declaration at Ex. 12.

(E.D.N.Y. Jan. 28, 2017). The district court found a substantial likelihood that the plaintiffs could establish that such removals would violate their rights to Due Process and Equal Protection under the United States Constitution. *Id.* at 1.

50.     Days later, on February 3, 2017, the United States District Court for the Western District of Washington issued a Temporary Restraining Order enjoining enforcement of the First Executive Order on a "nationwide basis." *Washington v. Trump*, No. 2:17-cv-00141-JLR, ECF 52 at 5 (W.D. Wash. Feb. 3, 2017). The Washington lawsuit was brought by the States of Washington and Minnesota and, like in the New York lawsuit, the district court in Washington found a substantial likelihood of success on the merits of the states' claims, which included challenges to the First Executive Order on the bases of, *inter alia*, the Free Exercise, Establishment, Due Process, and Equal Protection Clauses of the United States Constitution. *See id.* at 4; *see also* Complaint, *Washington v. Trump*, No 2:17-cv-00141-JLR, ECF 1 at 10-13 (W.D. Wash. Jan. 30, 2017) (asserting constitutional and other causes of action).

51.     The United States Court of Appeals for the Ninth Circuit upheld the Temporary Restraining Order issued by the District Court in Washington, in an opinion declining to stay the District Court's order. *Washington v. Trump*, 847 F.3d 1151, 1156 (9th Cir. 2017). The Ninth Circuit's opinion determined that Washington and Minnesota showed a likelihood of success on the merits of their procedural-due-process claim but reserved an analysis of the states' other claims for future proceedings and more-extensive briefing. *See id.* at 1168.

52.     While the Washington case proceeded, yet another lawsuit, in the United States District Court for the Eastern District of Virginia, resulted in a preliminary injunction of the Executive Order. The district court examined the litany of statements by President Trump and members of his Administration indicating their intent to ban Muslims from the United States and

found that the plaintiffs were likely to succeed on the merits of their Establishment Clause claims. *See Aziz v. Trump*, No. 1:17-cv-00116-LMB-TCB, ECF 111 at 7-9, 20 (E.D. Va. Feb. 13, 2017).

53.     In response to the ruling by the Ninth Circuit Court of Appeals, the President signaled his apparent intent to continue litigation over the First Executive Order, tweeting: "SEE YOU IN COURT, THE SECURITY OF OUR NATION IS AT STAKE!"[26] Yet just one week after the decision, the DOJ informed the Ninth Circuit that the President intended to rescind the First Executive Order and replace it with a "new *substantially revised* Executive Order to eliminate what the panel erroneously thought were constitutional concerns." Defendants-Appellants' Supplemental Brief on En Banc Consideration, *Washington v. Trump*, No. 17:35105, ECF 154 at 4 (9th Cir. Feb. 16, 2017) (emphasis added).

### F.     The Administration Contradicted Its Representations to the Ninth Circuit Court of Appeals.

54.     Despite the DOJ's representation to the Ninth Circuit Court of Appeals that the President would "rescind" the First Executive Order and issue an updated order, White House Press Secretary Sean Spicer told reporters at a February 21 press conference that President

---

[26] Donald J. Trump (@realDonaldTrump), TWITTER (Feb. 9, 2017, 3:35 PM), https://twitter.com/realdonaldtrump/status/829836231802515457, Weiner Declaration at Ex. 22 (capitalization included in original).

Trump would *not* rescind the First Executive Order.[27]  Instead, Spicer continued, the First

Executive Order would be "updated."[28]

     55.    The next day, Stephen Miller, a White House Senior Policy Advisor, said in an

interview with Fox News that the planned revised executive order would include "mostly minor

technical differences" but that "[f]undamentally, you're still going to have the *same basic policy

outcome for the country*."[29]

     56.    Like the February 21 statement by Mr. Spicer, Mr. Miller's statement contradicted

the DOJ's representations to the Ninth Circuit Court of Appeals, which stated that the new

executive order would be "substantially revised."

     57.    The contradictory statements from the Administration and its attorneys regarding

whether the President would rescind the First Executive Order and whether the Replacement

Executive Order would be "substantially revised" was noted by the court in the lawsuit

proceeding in the Western District of Washington.  *Ali v. Trump*, No. C17-0135JLR, ECF 49 at 3

(W.D. Wash. Mar. 3, 2017).

---

[27] Matthew Nussbaum, Josh Gerstein, & Christiano Lima, *White House creates confusion about future of Trump's travel ban*, POLITICO, (Feb. 21, 2017), http://www.politico.com/story/2017/02/trump-travel-ban-confusion-235241, Weiner Declaration at Ex. 71.

[28] *Id.*

[29] Matt Zapotosky, *A new travel ban with 'mostly minor technical differences'? That probably won't cut it, analysts say*, WASH. POST (Feb. 22, 2017), https://www.washingtonpost.com/world/national-security/a-new-travel-ban-with-mostly-minor-technical-differences-that-probably-wont-cut-it-analysts-say/2017/02/22/8ae9d7e6-f918-11e6-bf01-d47f8cf9b643_story.html?utm_term=.4b2c8de99d5f, Weiner Declaration at Ex. 2. (emphasis added).

58.     The Administration's doublespeak confirms its intention to satisfy the courts by claiming to "revoke" and "revise" the First Executive Order, while simultaneously championing its "same basic policy" of banning Muslims from the United States.

### G.     Lack of Justification for the Executive Orders

59.     On February 24, the Associated Press obtained a DHS report prepared at the request of the Acting Under Secretary for Intelligence and Analysis.[30]  The report, entitled "Citizenship Likely an Unreliable Indicator of Terrorist Threat to the United States," analyzed the terrorist threats posed by the seven countries targeted by the First Executive Order.[31]

60.     Even though the First Executive Order purported to "Protect[] the Nation from Foreign Terrorist Entry," one of the DHS report's key findings is that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity."[32]  As support for this finding, the report explains that "Citizens of Countries Affected by [the First Executive Order are] Rarely Implicated in US-Based Terrorism," and that "Few of the Impacted Countries Have Terrorist Groups that Threaten the West."[33]  The report stated that since the beginning of the Syrian conflict in 2011, 82 primarily U.S.-based individuals either died in the pursuit of or were

---

[30] Rick Jervis, *DHS memo contradicts threats cited by Trump's travel ban*, USA TODAY (Feb. 24, 2017, 7:09 PM), http://www.usatoday.com/story/news/2017/02/24/dhs-memo-contradict-travel-ban-trump/98374184/, Weiner Declaration at Ex. 72.

[31] *See id.*

[32] *Id.*

[33] *Id.*

convicted of terrorism-related federal offenses inspired by a foreign terrorist organization.[34]  Of these 82 individuals, slightly more than half were native-born United States citizens, with the rest coming from 26 different countries, including some—but not all—of the countries designated by the First Executive Order, and many other countries besides.[35]  The report also explains that nationals of the seven designated countries already have relatively limited access to the United States.[36]

61.     Additionally, even though the First Executive Order required the Secretary of Homeland Security to review and report whether foreign states were providing sufficient information for the United States government to adjudicate visa decisions,[37] the First Executive Order—and now the revised Executive Order, as well—banned immigration from the designated Muslim-majority countries *before* that review had even been conducted.

### H.     The Replacement Executive Order

62.     On March 6, 2017, President Trump issued a new executive order under the same name as the First Executive Order.  The new executive order replaces the First Executive Order (hereinafter "Replacement Executive Order") and includes some differences.  Namely, it removes Iraq from the list of targeted countries but subjects Iraqis to enhanced vetting

---

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] Executive Order 13,769 § 3(a), (b).

requirements in order to travel to the United States.  It also creates exceptions to the travel

restriction for legal permanent residents and people who held visas as of March 16, 2017.  And

finally, the Replacement Executive Order eliminates the priority for refugees of minority

religions, but it maintains the First Executive Order's restriction on the total number of refugees

permitted into the United States.  Just as Mr. Miller predicted, aside from these and other minor

differences, the Replacement Executive Order has the "same basic policy outcome" envisioned

by the first and continues to implement President Trump's promise—a "Muslim ban."

63.     On March 15, 2017, the United States District Court for the District of Hawaiʻi

issued a nationwide temporary restraining order against enforcement of the Replacement

Executive Order.  *Hawaiʻi v. Trump*, No. 1:17-00050-DKW-KSC, ECF 219 at 2, 42-43 (D. Haw.

Mar. 15, 2017).  The next day, the United States District Court for the District of Maryland

issued a preliminary injunction against enforcement of Section 2(c) of the Replacement

Executive Order (the provision restricting travel to the United States by nationals of Iran, Syria,

Yemen, Sudan, Libya, and Somalia).  *IRAP v. Trump*, No. 8:17-cv-00361-TDC, ECF149, at 2,

40-43 (D. Md. Mar. 16, 2017).

64.     Speaking at a rally in Nashville, Tennessee, on the same day that the Hawaiʻi

Court issued its ruling, President Trump called the ruling "terrible."[38]  He continued, stating that

---

[38] Matt Zapatosky, et al., *Federal judge in Hawaii freezes President Trump's new entry ban*,
WASHINGTON POST (Mar. 16, 2017), https://www.washingtonpost.com/local/social-
issues/lawyers-face-off-on-trump-travel-ban-in-md-court-wednesday-

Footnote continued on next page

the Replacement Executive Order was a "watered-down version of the first one" and that he thinks "we ought to go back to the first one and go all the way."[39]


### D.   Effects of the Executive Orders on Plaintiffs

#### i.   UMAA

65.     After the First Executive Order was issued, UMAA was forced to cancel an event that it had planned and to issue refunds for tickets that it had sold for the event. Specifically, UMAA had arranged for a renowned Shi'a eulogy reciter, Basm Nameliti, an Iranian national, to visit the United States for an event in Dearborn, Michigan, on February 4, 2017, commemorating the birthday of the granddaughter of the Prophet Muhammad. Mr. Nameliti uses the professional name Basim Karbalaei (hereinafter "Mr. Karbalaei" or "Karbalaei"). UMAA had invited Mr. Karbalaei to speak at the February 4th event on April 20, 2016. In the months and weeks leading up to February 4, UMAA heavily publicized the event among its members and sold approximately 2,200 tickets at $30 each.

66.     At that time, Mr. Karbalaei had received his United States travel visa. Because of the First Executive Order, however, his visa was revoked and he was prohibited from traveling to

---

Footnote continued from previous page

morning/2017/03/14/b2d24636-090c-11e7-93dc-00f9bdd74ed1_story.html, Weiner Declaration at Ex. 75.

[39] *Id.*

the United States. UMAA was thus forced to cancel the event and provide refunds to people who had purchased tickets. Providing these refunds cost UMAA over $15,000. Instead of the originally planned event, UMAA organized a "No Ban, No Wall" rally at the same venue in Dearborn, Michigan, in order to bring members of the community together in opposition to the First Executive Order.

67.    The Replacement Executive Order harms UMAA and its members because it effectively prevents UMAA from bringing Shi'a clergy to the United States to speak at its 2017 national convention and other events. As a consequence, the Replacement Executive Order restricts American Shi'a Muslims' access to many of the learned figures of their faith, and it harms UMAA's ability to attract paying attendees to its events. Moreover, the Replacement Executive Order's purported limitations fail to mitigate this harm.

68.    The Replacement Executive Order places UMAA in a position where it is effectively unable to invite speakers to its upcoming national convention, from June 30 to July 3, 2017, in Bethesda, Maryland, and other future events.

69.    For example, UMAA is unable to bring Mr. Karbalaei to the United States to speak at future events because his travel visa has expired. After the Ninth Circuit left in place the district court's preliminary injunction of the First Executive Order, UMAA invited Mr. Karbalaei to its 2017 national convention, for which he requires a new travel visa. Although Mr. Karbalaei wants to attend and speak at the convention, he is unable to secure a visa because of the Replacement Executive Order, and thus UMAA will again be unable to bring him to the United States to speak to its members.

70.    Inability to secure speakers has also harmed UMAA's ability to advertise and draw attendees to its events. For example, in previous years, UMAA has advertised its national

convention by providing prospective attendees with an advance schedule of speakers that includes the foreign speakers it has invited. This year, UMAA has been unable to advertise its event to include Iranian and Iraqi speakers because of the Executive Orders. And since these foreign speakers are one of the primary attractions for the national convention, the Replacement Executive Order significantly harms UMAA's ability to attract attendees.

71.     Consequently, the Replacement Executive Order harms UMAA's members because they cannot receive the teachings of their religion's most important scholars.

72.     Even though the Replacement Executive Order purports to allow case-by-case waivers for certain individuals, because it applies to *all* Iranian nationals and because there is no guarantee that any particular applicant will be granted a waiver, UMAA cannot determine which speakers to invite to its convention and other events because it does not know which speakers would be granted waivers.

73.     Because the scholars whom UMAA would invite to its convention are popular figures with multiple engagements, it is not practicable for UMAA to wait 90 days from the Replacement Executive Order's effective date of March 16 before inviting Iranian speakers. Ninety days from the effective date would be on or about June 12, 2017—less than three weeks from the start of UMAA's national convention—an insufficient amount of time to negotiate with and secure speakers and apply for and obtain their visas. The extreme vetting to which Iraqis are subjected under the Replacement Executive Order also raises a substantial risk that Iraqi invitees would be unable to obtain visas in time to attend the convention. For these reasons, UMAA also cannot advertise particular speakers ahead of time and thus is prevented from attracting paying attendees to its events.

74.     Accordingly, because the Replacement Executive Order effectively prevents UMAA from securing speakers from Iraq and Iran for its national convention and effectively prevents UMAA's members from receiving the teachings of their religion's most important clergy, UMAA seeks immediate relief from this Court.

75.     In addition to preventing UMAA's members from receiving the teachings of foreign Shi'a scholars, the Replacement Executive Order prevents UMAA's members living in the United States on single-entry visas from visiting Shi'a Islam's holy sites in Iran, Iraq, and Syria, and from making the Hajj, the annual pilgrimage to Mecca, a sacred rite for all Muslims. Moreover, UMAA's members with family living in countries targeted by the Replacement Executive Order are harmed because it prevents them from bringing their relatives to the United States as visitors or immigrants.

76.     Regardless of whether UMAA's individual members or their relatives abroad may be entitled to case-by-case waivers under the Replacement Executive Order, it still impermissibly subjects them to disparate treatment and additional procedural hurdles on the basis of their national origin or religion. Even if some waivers are ultimately granted, the waiver provision imposes significant barriers to entry and subjects applicants to the requirement that they demonstrate to the satisfaction of consular officials that their entry is in the national interest.

77.     UMAA seeks relief on behalf of its members because these harms are germane to UMAA's purpose of facilitating the religious, social, and political lives of American Shi'a Muslims. Because the declaratory and injunctive relief sought by UMAA in this case would also afford relief to its members, participation of any individual members would not be necessary for UMAA to obtain the relief it seeks.

ii.     **The Does**

78.     The Replacement Executive Order harms the Does because its enforcement renders them unable to bring their two children to the United States from Yemen and because it conveys a message to the Does that they and their religion are disfavored in the United States.

79.     The Does have not seen their two children in over 800 days.  They remain in fear for their children's lives and wish to bring them to the United States where they can be safe and so that their family can be together.

80.     Despite their attorney's best efforts to schedule interviews for the Does' sons, the State Department has not yet scheduled consular interviews for them.

81.     As with the First Executive Order, the Replacement Executive Order includes Yemen as one of the countries whose nationals are subject to the travel ban.[40]

82.     As long as Section 2(c) of the Replacement Executive Order is in effect, the Does' children will be categorically barred from entering the country for at least 90 days.

83.     The Replacement Executive Order does provide for discretionary "case-by-case waivers" for individuals seeking admission to the United States who can demonstrate to consular officials that their admission would be "in the national interest."[41] But the Does cannot seek a

---

[40] *See* Replacement Executive Order § 1(e)(vi).

[41] *See id.* § 3(c) (stating that case-by-case waivers may be available, "in the consular officer's or the CBP [Customs and Border Patrol] official's discretion" "if the foreign national has demonstrated to the officer's satisfaction that denying entry during the suspension period would cause undue hardship, and that his or her entry would not pose a threat to national security and would be in the national interest.").

waiver for their children if consular officials will not, at minimum, grant their children the interviews necessary to adjudicate their visa applications.

84.     Additionally, the Replacement Executive Order's "case-by-case" waiver provision harms the Does because it imposes an additional hurdle to securing visas for their two children and reuniting their family.  This additional hurdle forces the Does and their immigration attorney to provide additional information and representations to consular officials in excess of what other visa applicants must provide.  Moreover, the waiver provision imposes additional levels of review for the Does' children's visa applications, which must be conducted before the children can travel to the United States.  This additional scrutiny further complicates and delays the Does' reunification with their children.

85.     The Does are also harmed by the Replacement Executive Order's implicit condemnation of Islam.  The Does' religion is important to them, and they are pained by President Trump's denouncements of the Islamic faith and of Muslims generally.  The Does fear that they will face increased prejudice and hate as a result of the Replacement Executive Order.

86.     Because their two sons are in constant danger of being killed in Yemen, the Does cannot wait for the 90-day suspension of entry by Yemeni nationals provided in the Replacement Executive Order to expire.[42]  While the boys are now in Djibouti, they cannot afford to stay there

---

[42] *See id.* § 2(c).

indefinitely, and will soon need to return to Yemen if the Replacement Executive Order is not placed on hold.

87.     Accordingly, because the Replacement Executive Order applies to their two sons who are in physical danger in Yemen, and because consular officials have effectively denied any efforts to request case-by-case waivers, the Does seek immediate relief from this Court.

## CAUSES OF ACTION

### COUNT I
### (Violation of the Establishment Clause of the First Amendment)
### (All Plaintiffs Against All Defendants)

88.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

89.     The Establishment Clause of the First Amendment to the Constitution prohibits the government from enacting policies that "differentiate[] among religions." *Hernandez v. C.I.R.*, 490 U.S. 680, 695 (1989) (citing *Larson v. Valente*, 456 U.S. 228 (1982)).

90.     The Establishment Clause prohibits the government from endorsing or disapproving of a religion or certain religious beliefs. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000).

91.     The Establishment Clause prohibits the government from taking actions that lack a preeminently secular purpose, that have the effect of advancing or inhibiting religion, or that

result in excessive entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).

92.     The Replacement Executive Order and President Trump's own statements reveal that Sections 2(c) and 4 of the order seeks to discriminate against Muslims.  The President stated repeatedly that he would ban Muslims from immigrating to the United States.

93.     The Replacement Executive Order differentiates among religions because it singles out for unfavorable treatment countries that are almost entirely Muslim.

94.     The Replacement Executive Order violates the *Lemon* test because its text, development and implementation show that the measure lacks a predominantly secular purpose and has the effect of disfavoring and penalizing Islam and Muslims.  Notably, the President's and his surrogates' repeated statements show that the Executive Order's primary purpose is to exclude Muslims, and that its effect is to disapprove of Islam, Muslims, and their religious exercise.

95.     The Replacement Executive Order and the Defendants' implementation and enforcement of it violate Plaintiffs' rights under the Establishment Clause of the First Amendment.

96.     The Replacement Executive Order and the Defendants' implementation and enforcement of it have harmed Plaintiffs.

97.     The Doe plaintiffs are harmed because they are unable to bring their two sons from Yemen to the United States.  UMAA is harmed because it is unable to arrange to bring speakers from Iran and Iraq to the United States to its national convention and other events. UMAA's members are harmed because they are unable to receive the teachings of their religion's scholars and clergy.  UMAA's members are also harmed because many are separated

from their family members. All Plaintiffs (including UMAA's members) are also injured because of the government's endorsement of hostility toward Islam that is reflected in the Executive Order. All Plaintiffs are also harmed by the waiver provision under Section 3(c) of the Replacement Executive Order because the provision creates an additional hurdle that was imposed with a discriminatory purpose and a discriminatory effect to disfavor Muslims.

98.    Absent injunctive and declaratory relief, Plaintiffs will continue to suffer harm from the Replacement Executive Order and Defendants' implementation and enforcement of it.

99.    Plaintiffs have no adequate remedy at law.

100.

## COUNT II
### (Violation of the Right to Equal Protection Under the Fifth Amendment: Discrimination on the Basis of Religion)
### (All Plaintiffs Against All Defendants)

101.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

102.    Plaintiffs are entitled to the protections of the Fifth Amendment.

103.    In enacting and implementing the Replacement Executive Order, Defendants have discriminated against Plaintiffs on the basis of their religion in violation of the Equal Protection component of the Due Process Clause of the Fifth Amendment.

104.    The Replacement Executive Order was substantially motivated by animus toward Muslims.

105.    The Replacement Executive Order has a disparate impact on Muslims.

106.   Defendants' numerous public calls for a ban on Muslim immigration demonstrate that the Replacement Executive Order is designed to have a virtually exclusive impact on Muslims.

107.   Defendants' overt statements singling out Muslims for exclusion further reveal invidious discriminatory intent.

108.   Statements by advisers to Defendant Trump demonstrate that Defendants intend the Replacement Executive Order to yield the same results as the First Executive Order, that is, to exclude categories of foreign nationals that are almost entirely composed of Muslims.

109.   The Replacement Executive Order's targeting of certain countries on the basis of religion is not narrowly tailored to achieve a compelling governmental interest.

110.   The Replacement Executive Order is not rationally related to a legitimate governmental interest.

111.   The Replacement Executive Order was issued in bad faith and is not supported by bona fide and facially legitimate reasoning.

112.   Absent injunctive and declaratory relief, Plaintiffs will continue to suffer harm from the Replacement Executive Order and Defendants' implementation and enforcement of it.

113.   Plaintiffs have no adequate remedy at law.

**COUNT III**
**(Violation of the Right to Equal Protection Under the Fifth Amendment:**
**Discrimination on the Basis of National Origin)**
**(All Plaintiffs Against All Defendants)**

114.   Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth here.

115.   Plaintiffs are entitled to the protections of the Fifth Amendment.

116.    Defendants' enactment, implementation, and threatened enforcement of the Replacement Executive Order discriminate against Plaintiffs on the basis of their national origin, in violation of the right to equal protection under the Due Process Clause of the Fifth Amendment.

117.    The Replacement Executive Order singles out nationals of specific countries for exclusion from the United States, regardless of their individual circumstances.

118.    The Replacement Executive Order's discrimination on the basis of national origin is not narrowly tailored to achieve a compelling governmental interest.

119.    The Replacement Executive Order's discrimination on the basis of national origin is not rationally related to a legitimate governmental interest.

120.    The Replacement Executive Order was issued in bad faith and is not supported by bona fide and facially legitimate reasoning.

121.    Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the Replacement Executive Order and from the Defendants' implementation and enforcement of it.

122.    Plaintiffs have no adequate remedy at law.

**COUNT IV**
**(Violation of the First Amendment: Right to Receive Information and Ideas)**
**(UMAA Against All Defendants)**

123.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

124.    The Free Speech Clause of the First Amendment to the United States Constitution protects not only the right to engage in speech, but also the "right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

125.    The Replacement Executive Order and Defendants' implementation of it violate the right of UMAA and its members to receive information and ideas under the First Amendment to the United States Constitution.

126.    The Replacement Executive Order is not narrowly tailored to achieve a substantial governmental interest.

127.    The Replacement Executive Order was issued in bad faith and is not supported by bona fide and facially legitimate reasoning.

128.    Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the Replacement Executive Order and from the Defendants' implementation and enforcement of it.

129.    Plaintiffs have no adequate remedy at law.

### COUNT V
### (Violation of the Immigration and Nationality Act, Administrative Procedure Act, and Regulations)
### (UMAA Against All Defendants)

130.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

131.    The Immigration and Nationality Act, 8 U.S.C. § 1152(a)(1)(A), prohibits discrimination in the issuance of immigrant visas on the basis of race, nationality, place of birth, or place of residence.

132.    In implementing the Replacement Executive Order, Defendants have acted contrary to § 8 U.S.C. 1152(a)(1)(A) by discriminating on the basis of national origin in the issuance of immigrant visas.

133.    Defendants' violations of the Immigration and Nationality Act and Regulations have harmed UMAA and its members.  Many of UMAA's members have pending or approved petitions for their family members to obtain immigrant visas to travel to the United States.  The Replacement Executive Order prevents these individuals from being able to bring their family members to visit or live in the United States.

134.    The Replacement Executive Order has divided the families of UMAA's members, undermining UMAA's mission, which includes promoting the welfare of the Shi'a community in the United States and dispelling misgivings about Muslims and Islam.

135.    The actions of Defendants, as set forth above, are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and without observance of procedure required by law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A)-(D).

136.    Plaintiffs have no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

137.    This Court accordingly should declare that Defendants' implementation of the Replacement Executive Order violates the APA and INA.

138.    Absent injunctive and declaratory relief, the Plaintiffs will continue to suffer harm from the Replacement Executive Order and from the Defendants' implementation and enforcement of it.

139.    Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, all Plaintiffs seek an order and judgment to:

140.    Declare that Sections 2 and 4 of the Replacement Executive Order violate the Constitution and laws of the United States;

141.    Enjoin Defendants from:

a.    Enforcing Sections 2 and 4 of the Replacement Executive Order, including at any United States embassy, consulate, border, or point of entry;

b.    Applying Sections 2 and 4 of the Replacement Executive Order to deny, revoke, restrict, cancel, or delay issuance of any immigrant or nonimmigrant visa;

c.    Applying Sections 2 and 4 of the Replacement Executive Order to deny or suspend entry or admission to any person;

d.    Applying Sections 2 and 4 of the Replacement Executive Order to prohibit any person from applying for any benefit under the Immigration and Nationality Act;

e.    Denying any person subject to the Replacement Executive Order access to legal counsel of his or her choice;

f.    Applying Sections 2 and 4 of the Replacement Executive Order to instruct any airline or other common carrier to deny passage to any person;

g.    Imposing or threatening to impose any financial penalty on any airline or other common carrier for allowing passage to any person covered by Sections 2 and 4 of the Replacement Executive Order;

142.    Order Defendants promptly to provide written guidance to employees, contractors, and agents of DHS, the State Department, U.S. Customs and Border Protection and all other United States government officials and entities necessary to ensure full and timely compliance with all terms of the order to be entered by the Court;

143.    Require Defendants promptly to rescind any guidance, directive, memorandum, or statement interpreting or applying the Replacement Executive Order that conflicts with any term of the order to be entered by the Court;

144.    Require Defendants promptly to post a copy of the written guidance required under paragraph 141 on government websites, including state.gov;

145.    Issue a nationwide injunction;

146.    Require Defendants promptly to update all relevant public guidance, documentation, and FAQs to reflect the terms of the order to be entered by the Court;

147.    Require Defendants promptly to reissue any and all physically cancelled visas;

148.    Require Defendants to instruct the consular officials handling the visa applications of the Doe children to schedule visa interviews within 10 days and to adjudicate the Doe children's visa applications within 7 days of their interviews;

149.    Require Defendants to process without undue delay visa applications submitted by nationals of Iran, Sudan, Somalia, Yemen, Syria, Libya, and Iraq.

150.    Require Defendants to file with the Court, on the tenth day of each month following the entry of the Court's order, a signed and verified declaration stating:

    a.    The number of United States visas granted during the previous month to nationals of each of the following countries: Iran, Sudan, Somalia, Yemen, Syria, Libya, and Iraq;

    b.    The number of United States visa applications denied during the previous month to nationals of each of the following countries: Iran, Sudan, Somalia, Yemen, Syria, Libya, and Iraq;

    c.       For each denied visa application under the above subparagraph (b), the identifying information or numbers for the application for the Court's reference;

    d.       For each denied visa application under the above subparagraph (b), a detailed explanation of the reason or reasons why the application was denied.  The explanation under this subsection must state the facts, authorities, and reasoning relevant to the Defendants' decision to deny the application.

151.    Require Defendants to pay reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

152.    Any other relief that the Court deems necessary or just to cure the violations specified in this Complaint or that justice may otherwise require.

DATED:      March 23, 2017.

Johnathan Smith (*application for admission pending*)
Aziz Huq (*pro hac vice application forthcoming*)
MUSLIM ADVOCATES
P.O. Box 71080
Oakland, CA 94612
Telephone: (415) 692-1484
Johnathan@muslimadvocates.org
huq@chicago.edu
jsulahry@gmail.com

Richard B. Katskee (D.C. Bar # 474250)
Bradley Girard (*application for admission pending*)
AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE
1310 L Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 466-3234
Facsimile: (202) 466-3353
Katskee@au.org
Girard@au.org

Gillian B. Gillers (*pro hac vice application forthcoming*)
Kristi L. Graunke (*pro hac vice application forthcoming*)
Naomi R Tsu (*pro hac vice application forthcoming*)
SOUTHERN POVERTY LAW CENTER
1989 College Avenue NE
Atlanta, GA 30317
Telephone: (404) 521-6700
Facsimile: (404) 221-5857
gillian.gillers@splcenter.org
kristi.graunke@splcenter.org
naomi.tsu@splcenter.org

David J. Weiner (D.C. Bar # 499806)
Charles A. Blanchard (D.C. Bar # 1022256)
Amanda Johnson (*application for admission pending*)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
David.weiner@apks.com
Charles.blanchard@apks.com
Amanda.johnson@apks.com

Emily Newhouse Dillingham (*pro hac vice application forthcoming*)
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street
Chicago, IL 60602
Telephone: (312) 583-2300
Facsimile: (312) 583-2360
Emily.dillingham@apks.com

Andrew D. Bergman (*pro hac vice application forthcoming*)
ARNOLD & PORTER KAYE SCHOLER LLP
700 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: (713) 576-2400
Facsimile: (713) 576-2499
Andrew.bergman@apks.com

Kimberly Gelfand (*pro hac vice application forthcoming*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689
Kimberly.gelfand@apks.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certified that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 23, 2017.

David J. Weiner (D.C. Bar # 499806)
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, DC  20001-3743
David.weiner@apks.com

40